UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| BELIA T., | ) | No. CV 20-4513-PLA |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW M. SAUL, COMMISSIONER | ) | |
| OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**I.**

**PROCEEDINGS**

Belia T.[1] ("plaintiff") filed this action on May 19, 2020, seeking review of the Commissioner's denial of her applications for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments.  The parties filed Consents to proceed before a Magistrate Judge on June 16, 2020.  Pursuant to the Court's Order, the parties filed a Joint Submission (alternatively "JS") on June 4, 2021, that addresses their positions concerning the

_____

[1]    In the interest of protecting plaintiff's privacy, this Memorandum Opinion and Order uses plaintiff's (1) first name and last initial, and (2) year of birth in lieu of a complete birth date.  See Fed. R. Civ. P. 5.2(c)(2)(B), Local Rule 5.2-1.

disputed issues in the case.  The Court has taken the Joint Submission under submission without oral argument.

## II.

## BACKGROUND

Plaintiff was born in 1955.  [Administrative Record ("AR") at 193, 195.]  She has past relevant work experience as a home attendant.  [Id. at 23, 50.]

On May 9, 2016, plaintiff protectively filed applications for a period of disability and DIB, and for SSI payments, alleging that she has been unable to work since March 1, 2013.  [Id. at 15; see also id. at 193-94, 195-99.]  After her applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [Id. at 135-36.]  A hearing was held on January 31, 2019, at which time plaintiff appeared represented by an attorney, and testified on her own behalf.  [Id. at 28-54.]  A vocational expert ("VE") also testified.  [Id. at 50-53.]  On February 8, 2019, the ALJ issued a decision concluding that plaintiff was not under a disability from March 1, 2013, the alleged onset date, through February 8, 2019, the date of the decision.  [Id. at 15-23.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [Id. at 189-92.]  When the Appeals Council denied plaintiff's request for review on March 17, 2020 [id. at 1-5], the ALJ's decision became the final decision of the Commissioner. See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence . . . is 'more than a mere scintilla[,]' . . . [which] means -- and means

only -- 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (citations omitted); Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld."  Revels, 874 F.3d at 654 (internal quotation marks and citation omitted).  However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)).  The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed.  626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

**IV.**

**THE EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting 42 U.S.C. § 423(d)(1)(A)).

**A.    THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lounsbury v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006) (citing Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999)). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Lounsbury,

468 F.3d at 1114.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).  If the claimant meets this burden, a prima facie case of disability is established.  Id.  The Commissioner then bears the burden of establishing that the claimant is not disabled because there is other work existing in "significant numbers" in the national or regional economy the claimant can do, either (1) by the testimony of a VE, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P, appendix 2.  Lounsbury, 468 F.3d at 1114.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995); Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since March 1, 2013, the alleged onset date, and that she met the insured status requirements through September 30, 2015.  [AR at 17, 18.]  He also found that prior to September 30, 2015, the date last insured, "the evidence does not demonstrate more than mild clinical findings."  [Id. at 18.]  Accordingly, he denied plaintiff's application for a period of disability and DIB benefits at step two, because "there is no evidence of a severe impairment on or before" the date last insured.  [Id.]

1    The ALJ thereafter considered only plaintiff's application for SSI payments, which was filed

2    on May 9, 2016.  [Id.]  In that respect, he concluded that as of May 9, 2016, plaintiff has the severe

3    impairments of degenerative disc disease of the lumbar spine, and osteoarthritis of the bilateral

4    knees.   [Id.]   He found plaintiff's medically determinable conditions of thyroid dysfunction,

5    hyperlipidemia, obesity, bilateral upper extremity pain, and affective disorder to be nonsevere

6    because they resulted in no more than mild work-related functional limitations.   [Id.]   He

7    determined at step three that plaintiff does not have an impairment or a combination of

8    impairments that meets or medically equals any of the impairments in the Listing.  [Id. at 19.]  The

9    ALJ further found that plaintiff retained the residual functional capacity ("RFC")[2] to perform medium

10   work as defined in 20 C.F.R. § 416.967(c),[3] with the following limitations:

11       [S]he can only occasionally stoop, crouch, and crawl; she can frequently perform all
         other postural activities.
12

13   [Id. at 20.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded

14   that plaintiff is able to perform her past relevant work as a home attendant (Dictionary of

15   Occupational Titles ("DOT") No. 354.377-014).   [Id. at 23, 50-51.]   Accordingly, the ALJ

16   determined that plaintiff was not disabled at any time from the alleged onset date of March 1,

17   2013, through February 8, 2019, the date of the decision.  [Id. at 23.]

18   /

19   /

20   /

21   _____

22       [2]   RFC is what a claimant can still do despite existing exertional and nonexertional
     limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps
23   three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which
     the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149,
24   1151 n.2 (9th Cir. 2007) (citation omitted).

25       [3]   "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or
26   carrying of objects weighing up to 25 pounds.  A full range of medium work requires that a person
     be able to stand or walk, off and on, for a total of approximately six hours of an eight-hour
27   workday.  SSR 83-10; Candia v. Sullivan, 959 F.2d 239, 239 (9th Cir. 1992).  If someone can do
     medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §§
28   404.1567(c), 416.967(c).

V.

**THE ALJ'S DECISION**

Plaintiff contends that the ALJ erred when he:  (1) evaluated the medical evidence and opinions; (2) determined plaintiff's severe impairments; (3) determined plaintiff's RFC; and (4) evaluated plaintiff's subjective symptom testimony.  [JS at 3.] As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

A.   **THE ALJ'S RFC DETERMINATION AND EVALUATION OF THE MEDICAL EVIDENCE**

1.   **Legal Standards**

An RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Soc. Sec. Ruling ("SSR")[4] 96-9p, 1996 WL 374184, at *1 (1996).  It reflects the most a claimant can do despite her limitations.  See Smolen v. Chater, 80 F.3d 1273, 1291 (9th Cir. 1996).  An RFC must include an individual's functional limitations or restrictions as a result of all of her impairments -- *even those that are not severe* (see 20 C.F.R. § 404.1545(a)(1)-(2), (e)) -- and must assess her "work-related abilities on a function-by-function basis."  SSR 96-9p, 1996 WL 374184, at *1; see also Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009) ("an RFC that fails to take into account a claimant's limitations is defective").  An ALJ errs when he provides an incomplete RFC ignoring "significant and probative evidence."  Hill v. Astrue, 698 F.3d 1153, 1161-62 (9th Cir. 2012) (further noting that the error is not harmless when an ALJ fails to discuss significant and probative evidence favorable to a claimant's position because when the RFC is incomplete, the hypothetical question presented to the VE is incomplete and, therefore, the ALJ's reliance on the VE's answers is improper).  An RFC assessment is ultimately an administrative finding reserved to the Commissioner.  20 C.F.R. § 404.1527(d)(2).  However, an RFC determination must be

---

[4]   "SSRs do not have the force of law.  However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference.  We will not defer to SSRs if they are inconsistent with the statute or regulations."  Holohan v. Massanari, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

1   based on all of the relevant evidence, including the diagnoses, treatment, observations, and

2   opinions of medical sources, such as treating and examining physicians. Id. § 404.1545.  A district

3   court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard

4   and substantial evidence in the record as a whole supports the decision.  See Bayliss v. Barnhart,

5   427 F.3d 1211, 1217 (9th Cir. 2005); Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).

6        Furthermore, "the ALJ may only reject a treating or examining physician's uncontradicted

7   medical opinion based on clear and convincing reasons."  Trevizo v. Berryhill, 871 F.3d 664, 675

8   (9th Cir. 2017) (citing Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008)).  "Where

9   such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons

10  that are supported by substantial evidence in the record."  Id. (citing Ryan, 528 F.3d at 1198).

11  When a treating physician's opinion is not controlling, the ALJ should weigh it according to factors

12  such as the nature, extent, and length of the physician-patient working relationship, the frequency

13  of examinations, whether the physician's opinion is supported by and consistent with the record,

14  and the specialization of the physician.   Trevizo, 871 F.3d at 676; see 20 C.F.R. §

15  404.1527(c)(2)-(6).  The ALJ can meet the requisite specific and legitimate standard "by setting

16  out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

17  interpretation thereof, and making findings." Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998).

18  The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or

19  examining] doctors', are correct."  Id.

20

21       **2.   Background**

22       Plaintiff argues that the ALJ erred in formulating plaintiff's RFC by failing to give proper

23  weight to evidence from her treating physician Erlinda Grey, M.D., and to the July 15, 2016,

24  opinion of Trevor Scott, M.D., the consultative orthopedic surgeon.  [JS at 3, 17.]  Specifically,

25  plaintiff contends that the RFC determination was deficient for the following reasons:  (1) the ALJ

26  erred in finding that plaintiff did not have any severe impairments prior to September 2015; (2) he

27  erred in finding that her bilateral upper extremity condition was a nonsevere impairment; (3) his

28

1    RFC assessment is not consistent with the treating and examining physicians' clinical findings or

2    opinions; and (4) he incorrectly found that plaintiff's statements and testimony regarding her

3    symptoms and limitations were not consistent with the medical evidence and other evidence in the

4    record. [JS at 3.] She contends that these findings are not supported by substantial evidence and

5    that the ALJ erred when he "ignored or rejected treating and examining physician records,

6    opinions and clinical findings." [Id. at 3-4.]

7

8        **3.    Medical Evidence Ignored or Rejected by the ALJ**

9            **a.    Dr. Grey**

10       The record reflects that Dr. Grey treated plaintiff between 2014 and 2018.  With respect to

11   Dr. Grey's treatment, the ALJ noted the following:

12           Medical imaging evidence of [plaintiff's] lumbar spine revealed relatively mild to
             moderate degenerative changes.  A July 2016 x-ray of [plaintiff's] lumbar spine
13           showed mild to moderate degenerative disc disease at L1-L2 and L4-L5 and
             moderate facet spondylosis at L5-S1 and L4-L5.  An x-ray taken in July 2017, a year
14           later, showed that there were no significant degenerative changes since [plaintiff's]
             prior x-ray.  A January 2018 MRI of [plaintiff's] lumbar spine showed moderate facet
15           arthropathy at L[4]-L5 and L5-S1 and mild degenerative changes at additional levels
             throughout the lumbar spine without significant central canal or foraminal stenosis.
16           I note that there is no additional medical imaging of [plaintiff's] knees in the record.

17           Although [plaintiff] sought regular medical care for her musculoskeletal pain, the
             medical records provided by [plaintiff] are sparse and at times illegible, without clear
18           objective findings or detailed progress notes.  For example, in December 2015,
             [plaintiff] complained to [Dr. Grey] of back and joint pain.  Dr. Grey did not note any
19           objective clinical findings, but diagnosed [plaintiff] with osteoarthritis and prescribed
             her pain medication.  Progress notes from September 2017 and May 2018 indicate
20           that [plaintiff] had continued complaints of low back pain and numbness in her feet.
             Again Dr. Grey failed to note any objective clinical findings regarding [plaintiff's] back
21           or legs.

22   [AR at 21-22 (citing id. at 372, 411, 412-14).]

23       Plaintiff generally contends that the ALJ failed to provide sufficient analysis to support his

24   conclusion that Dr. Grey's records were "sparse, sometimes illegible and did not include clear

25   objective findings or detailed progress notes."  [JS at 6 (citing AR at 21).]  She notes that Dr.

26   Grey's records spanned from February 2014 through October 2018, and while they "may be

27   difficult to decipher as they are handwritten, they are not illegible as the AL asserted."  [Id.]

28

By way of example, plaintiff asserts that the records pre-dating September 2015 (her date last insured) support the existence of severe impairments prior to that date. [Id. at 6-7.] She notes that in December 2014 she presented to Dr. Grey with low back pain and stiffness, as well as shoulder pain and stiffness [id. at 6 (citing AR at 368)]; and in July 2015 she presented with joint pain in her fingers, wrists, and knees, along with back pain and spasms [id. (citing AR at 367).] Dr. Grey's clinical findings at those visits included back spasms and swelling in the hands.  [Id. (citing AR at 367).]  August 2015 lab results reviewed by Dr. Grey included positive ANA findings consistent with plaintiff's reports of pain and inflammation[5] [id. at 6-7 (citing AR at 366)]; and, based at least in part on those lab results, Dr. Grey diagnosed degenerative joint disease and osteoarthritis.  [Id. (citing AR at 366).]

Plaintiff further notes that after the date last insured, Dr. Grey continued to document plaintiff's treatment for pain in the upper extremities and back.  [Id. at 7.]  For instance, in December 2015 plaintiff reported pain in all of her joints and in her back, and Dr. Grey again diagnosed her with osteoarthritis.  [Id. (citing AR at 363).]  In February 2016, she presented with left shoulder pain, chest pain, back pain, left arm pain, numbness in both hands, insomnia, and anxiety.  [Id. (citing AR at 362).]  On examination Dr. Grey found left shoulder pain and limited range of motion, and diagnosed "left shoulder strain, rule out degenerative joint disease vs arthritis."  [Id. (citing AR at 362).]  Accordingly, Dr. Grey sought authorization for a left shoulder x-ray (although there is no record of a left shoulder x-ray being obtained).  [AR at 362.]  In April 2016, plaintiff presented with pain in both hands and low back pain [JS at 7 (citing AR at 361)]; in May 2016, she presented with pain in her right hip for three months and a painful burning sensation on the thumb area of both hands, and Dr. Grey sought to rule out degenerative joint disease, and diagnosed sciatica/fibromyalgia, and neuropathy [id. (citing AR at 360)]; in June 2016, plaintiff was again diagnosed with sciatica, and Dr. Grey sought authorization for a left hand x-ray (although there is no record of a left hand x-ray being obtained) [id. (citing AR at 359)]; in

---

[5]      An ANA test detects antinuclear antibodies in the blood and a positive ANA test indicates an autoimmune reaction that reflects an autoimmune disease such as lupus, rheumatoid arthritis, or scleroderma.  http://www.mayoclinic.org/test-procedures/ana-test (last visited June 16, 2021).

July 2016, Dr. Grey reviewed an x-ray of plaintiff's lumbar spine and diagnosed degenerative disc disease and degenerative arthritis [id. (citing AR at 395)]; and in December 2016, plaintiff again presented with pain in her right hip, legs, and hands [id. (citing AR at 394)].

Plaintiff points to additional similar records after December 2016 reflecting pain starting at the back of her neck and radiating down to her right shoulder; pain in the lower back; numbness in the left foot and legs; numbness in her hand and foot; shoulder pain; pain in both elbows; sharp pain in her left arm, left shoulder greater than the right shoulder; and pain in her foot.  [Id. (citing AR at 422, 424, 426, 427, 428, 431).]  At those visits, along with noting plaintiff's hypothyroidism and referral to an endocrinologist [see, e.g., AR at 422], Dr. Grey diagnosed pain and neuropathy [id. at 428]; spinal stenosis at L4-L5 [id. at 427]; bilateral shoulder pain [id. at 426]; lumbar anterolisthesis [id. at 424]; and arthritis with radiculopathy [id. at 422].

Plaintiff observes that clinical findings support her symptoms and Dr. Grey's diagnoses. For instance, in July 2016 an x-ray of her lumbar spine showed mild to moderate degenerative disc disease at L1-L2 and L4-L5, along with moderate facet spondylosis at L5-S1, with suggestion of neural foraminal narrowing at this level, and moderate facet spondylosis at L4-L5 with 2 mm of anterolisthesis of L4 on L5 [id. at 372]; a July 2017 lumbar spine x-ray reflected degenerative anterolisthesis of L5 over S1, and was otherwise consistent with the July 2016 x-ray [id. at 411]; and a January 2018 MRI of the lumbar spine showed a 2mm anterolisthesis secondary to facet arthropathy at L4-L5, moderate on the right and mild on the left with mild left lateral recess narrowing and foraminal narrowing [id. at 414], as well as a 2 mm anterolisthesis at L5-S1 related to moderate facet arthropathy, and mild degenerative changes at additional levels throughout the lumbar spine [id.].

Plaintiff submits that Dr. Grey's records reflect pain in plaintiff's upper extremities as early as December 2014, and ongoing through 2018.  [JS at 8.]  She argues that the ALJ erred when he "neglected to discuss or consider the content of these records" in determining that plaintiff's upper extremity impairment was not severe and in formulating the RFC.  [Id.]  She further contends that the ALJ erred in "failing to provide reasoning or analysis to support ignoring and

1    functionally rejecting Dr. Grey's records," which she contends are not sparse and not wholly

2    illegible.  [Id.]  She also contends that Dr. Grey's opinions and diagnoses "are supported by her

3    clinical findings and objective testing, and are also consistent with Dr. Scott's clinical findings and

4    diagnoses." [Id.]  As such. the ALJ's reasons for ignoring and/or rejecting Dr. Grey's records were

5    not specific and legitimate, or clear and convincing, and he failed to provide an explanation and

6    analysis to support his own interpretation of the evidence.  [Id. at 8-9.]

7         Defendant responds that the ALJ "appropriately noted that although Plaintiff sought regular

8    medical care for her alleged musculoskeletal pain, Dr. Grey's medical records were sparse and

9    at times illegible, without clear objective findings or detailed progress notes." [Id. at 13 (citing AR

10   at 21).]  He argues that plaintiff "relies on Dr. Grey primarily to document her own subjective

11   complaints of pain and numbness." [Id.]  As such, defendant contends that "Dr. Grey's treatment

12   notes served little useful purpose insofar as they primarily documented Plaintiff's subjective

13   complaints, and did not provide a functional assessment."[6] [Id. at 14.]

14

15         **b.**     **Dr. Scott**

16         On July 15, 2016, Dr. Scott examined plaintiff for an orthopedic consultative examination.

17   On examination, Dr. Scott found the following:  palpable paraspinal muscle spasm on the right with

18   tenderness to palpation in the right paraspinal muscles and buttocks; with respect to the right

19   elbow and forearm he noted positive Tinel's at the cubital tunnel with radiation to the thumb and

20   index finger; with respect to the right wrist and fingers he noted tenderness to palpation at the first

21   CMC joint with positive grind test, positive Tinel's with radiation to the index and right finger, and

22   tenderness at the A1 pulley of the index finger; with respect to the left wrist and fingers, plaintiff

23   exhibited positive Tinel's at the carpal tunnel with radiation to the ring and index finger and a mildly

24   positive first CMC grind test.  [AR at 377-83.]

25         Dr. Scott diagnosed plaintiff with bilateral carpal tunnel syndrome, "based on [plaintiff's]

26

27        [6]    This was not a reason given by the ALJ for discounting Dr. Grey's treatment notes.  The Court will not consider reasons for rejecting Dr. Grey's findings that were not given by the ALJ in

28   the Decision.  See Trevizo, 871 F.3d at 677 & nn.2, 4 (citation omitted).

positive Tinel's"; positive right cubital tunnel syndrome, "based on [plaintiff's] positive Tinel's at the cubital tunnel on the right side"; right index finger trigger finger, "based on [plaintiff's] tenderness at the A1 pulley on that side"; bilateral first CMC joint osteoarthritis, "based on [plaintiff's] positive grind test at bilateral CMC joints"; and "likely lumbar spine degenerative disc disease with stenosis based on [plaintiff's] tenderness to palpation, age, decreased range of motion, palpable muscle spasm and radiation to the right buttocks." [Id. at 382.] Dr. Scott also noted plaintiff's "decreased sensation in the median nerve distribution in the right and left upper extremity." [Id. at 381.] Based on his examination findings, Dr. Scott opined that plaintiff was limited to light work, including lifting and carrying 20 pounds occasionally and 10 pounds frequently; occasional bending, crouching, kneeling, crawling, or stooping; occasional climbing, balancing, walking on uneven terrain or at heights; may use a cane if she desires (although not required); occasional reaching, grasping, and manipulation with the bilateral upper extremities; and occasional overhead activity. [Id.]

The ALJ gave "some" weight to Dr. Scott's opinion. [Id. at 22.] He acknowledged the more restrictive RFC determined by Dr. Scott but stated that Dr. Scott's exertional and postural limitations are "inconsistent with the relatively mild to moderate degenerative findings in the record." [Id.] He also observed that Dr. Scott's manipulative limitations are "inconsistent with the longitudinal record," as there was no EMG study to support Dr. Scott's diagnosis of carpal tunnel syndrome. [Id.]

Plaintiff contends that the ALJ failed to provide "sufficient discussion and analysis of Dr. Scott's opinion, which included clinical findings to support his diagnosis and limitations, and the record as a whole to support rejecting the opinion of an examining physician." [JS at 9.] She notes that the ALJ also failed to acknowledge the consistencies between Dr. Grey's records and Dr. Scott's findings. [Id.] She argues that Dr. Scott's opinion "was explained and included consistent clinical findings," and that as an orthopedic specialist, his opinion "should have been entitled to proper weight and consideration." [Id. at 10.] Plaintiff notes that the only opinions contradicting Dr. Scott's opinion were provided by the non-examining state-agency physicians who

opined that plaintiff's physical impairments were entirely nonsevere; indeed, the ALJ gave "little weight" to these opinions based on the additional information provided at the hearing level, including additional treatment records, and more recent x-ray/MRI reports of plaintiff's lumbar spine.  [Id. at 22 (citations omitted).]  She argues that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence to reject Dr. Scott's opinion, and that it is improper for him to "simply ignore any medical opinion in the record, including ignoring portions of the opinions or failing to provide reasoning or analysis to support rejecting portions of opinions." [JS at 11.]  Plaintiff further contends that the ALJ "failed to set forth specific analysis to support his own interpretation of the record over the opinions, clinical findings and diagnoses of treating and examining physicians."  [Id.]  She states that it is unclear "what evidence the ALJ relied on in formulating the RFC assessment as the ALJ's RFC assessment is not consistent with any physician opinion in the record and [he] failed to provide analysis and explanation to support" that assessment.  [Id.]  As such, she asserts that the ALJ "erred in substituting his own lay opinion for that of the competent opinion provided by Dr. Scott as an orthopedist and examining physician." [Id. (citation omitted).]

Plaintiff concludes that the ALJ's failure to properly consider the entirety of the medical evidence, including the opinions, clinical findings, and records provided by plaintiff's treating physician and by the examining physician, is not harmless error.  [Id.]  She notes that if the ALJ had "afforded proper consideration to the full opinions and records of Dr. Grey and Dr. Scott, this would have impacted severe impairments found at Step 2, the residual functional capacity assessment, weight afforded to [plaintiff's] testimony and statements, vocational expert testimony and have resulted in different findings at steps 4 and 5," thereby impacting the ultimate question of disability.  [Id. at 11-12.]

To support his contention that the ALJ did not err in discounting Dr. Scott's opinion, defendant cites to Dr. Scott's findings (also cited to by the ALJ) that plaintiff walked with a normal gait; did not use an assistive device to ambulate; was able to rise from a sitting and supine position without difficulty; had a negative straight leg raising test; examination of her lower extremities,

including her knees, was within normal limits; and she exhibited full motor strength and normal reflexes in both her upper and lower extremities.  [Id. at 14.]  Defendant concludes that the ALJ properly found that, "based on his review of Dr. Scott's consultative examination in the context of the record as a whole," "the extent of the exertional, postural, and manipulative limitations to which Dr. Scott opined were inconsistent with the relatively mild to moderate degenerative findings in the record."  [Id. at 15.]  Defendant also observes that "the ALJ noted that the record lacked any EMG or nerve conduction studies that would support a diagnosis of carpal tunnel syndrome," and "[a]s such, . . . reasonably afforded Dr. Scott's opinion only some weight."  [Id.]  He concludes that the ALJ "reasonably considered the medical evidence of record, including that from Drs. Grey and Scott," and substantial evidence supports the ALJ's decision.  [Id.]

Plaintiff replies that Dr. Scott's opinion "was consistent with and supported by his own examination findings as well as the reports of Dr. Grey, which also document pain and limitations in the upper extremities."  [Id. at 16.]  She reiterates that the ALJ failed to properly evaluate all of the medical opinion evidence concerning her impairments; failed to evaluate the evidence of record as a whole and provide analysis based on that evidence to support his findings; failed to articulate a "substantive basis" for rejecting the medical opinions of Dr. Grey and Dr. Scott; failed to provide sufficient consideration to Dr. Grey as a treating physician for more than four years; and failed to consider Dr. Grey's records and the examination findings and opinion of Dr. Scott "in conjunction with one another."  [Id. at 16-17.]  She points out that Dr. Scott's clinical findings in the bilateral upper extremities, supported his diagnoses of bilateral carpal tunnel syndrome, and cubital tunnel syndrome on the right, and that he personally examined plaintiff and provided a detailed report and opinions supported by his clinical findings.  [Id. at 17.]  Plaintiff concludes that the error was not harmless because it impacted plaintiff's RFC and the ultimate question of disability.  [Id. at 18.]

/

/

/

### c.    Analysis

The Court, having reviewed the record and the arguments of the parties, agrees with plaintiff that the ALJ failed to consider the record as a whole, failed to consider the records and opinions of Dr. Grey and Dr. Scott in conjunction with each other, and failed to provide specific and legitimate reasons supported by substantial evidence for discounting or rejecting the opinions of Dr. Grey and Dr. Scott.

While Dr. Grey's records and notes are handwritten and at times illegible, certain themes are clear and present throughout.  For instance, Dr. Grey treated plaintiff for over four years for at least her back pain, shoulder pain, neck pain, and hand pain, and sought (and sometimes obtained) authorization for clinical testing as well as for consultative specialists.  In short, Dr. Grey's treatment notes are not without clinical findings (or attempts to obtain authorization for clinical testing).

Dr. Grey's notes and records reflect the following findings:  in July 2015, plaintiff's hands were noted to be swollen; positive ANA laboratory test results in July and August 2015 (possibly indicative of an autoimmune disorder such as rheumatoid arthritis); limitation on range of motion in the left shoulder in February 2016 for which she referred plaintiff for an x-ray; a request for authorization for a left hand x-ray in May 2016 and again in June 2016; a request for authorization for an x-ray of plaintiff's lumbar spine that was obtained in July 2016; based on the July 2016 x-ray results, Dr. Grey confirmed diagnoses of degenerative disc disease and degenerative arthritis; a request for authorization for another lumbar spine x-ray that was obtained in July 2017; a request in September 2017 for authorization for an expedited orthopedic consultation; a request for authorization for a lumbar spine MRI that was performed in January 2018; in August 2018, Dr. Grey noted bilateral 2+ lower extremity edema; also in August 2018, she requested authorization for an x-ray of both shoulders; in May 2018 she again requested an expedited orthopedic consultation; and in September 2018 she yet again requested authorization for an orthopedic consultation.

Additionally, although the ALJ rejected Dr. Scott's opinion regarding plaintiff's upper

extremity diagnoses and manipulative limitations because no EMG or nerve conduction test had been conducted, Dr. Scott, an orthopedic surgeon, was more than qualified to give his opinion as to the results of his in-person clinical examination, which, in his opinion, demonstrated that plaintiff had the impairments of bilateral carpal tunnel syndrome, right cubital tunnel syndrome, right index trigger finger, and bilateral 1st CMC joint osteoarthritis.  [AR at 382.]  In fact, while Dr. Scott was not hesitant to "hedge" his diagnosis with respect to plaintiff's lumbar spine issues without additional clinical information -- deeming it only "[l]ikely" that she had lumbar spine degenerative disease with stenosis based on her age, decreased range of motion, palpable muscle spasm, and radiation to the right buttocks [see id.] -- he included no such limiting language with respect to the results of his bilateral upper extremity testing, diagnoses, and manipulative limitations.  Indeed, Dr. Scott specifically stated that he based his upper extremity diagnoses of bilateral carpal tunnel syndrome, positive right cubital tunnel syndrome, right index finger trigger finger, and bilateral 1st CMC joint osteoarthritis, on his clinical examination findings:  positive Tinel's on both sides; positive Tinel's at the cubital tunnel on the right side; tenderness at the A1 pulley on the right index finger; and positive grind test at plaintiff's bilateral CMC joints.  [Id.]  Dr. Scott did not suggest that his bilateral upper extremity diagnoses were in any way less certain simply because no EMG or nerve conduction test had been conducted confirming those diagnoses.

The Court finds that the ALJ's determination that plaintiff remains capable of performing medium work is inconsistent with Dr. Scott's expert (and essentially uncontradicted) opinion that plaintiff is limited to a reduced range of light work, largely as a result of her upper extremity diagnoses.  Additionally, in the face of Dr. Grey's treatment records; the fact that there is no evidence that Dr. Grey (or Dr. Scott) ever questioned plaintiff's credibility with respect to the symptoms she was reporting; Dr. Grey's and Dr. Scott's similar and consistent findings, clinical test results, and diagnoses; and Dr. Scott's opinion limiting plaintiff to a range of light work and including further manipulative limitations with respect to the use of her bilateral upper extremities, the ALJ failed to provide a sufficient explanation to support his conclusion that plaintiff was capable of medium work without *any* limitations in reaching, grasping, overhead activity, and

manipulation.[7]

Based on the foregoing, the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for ignoring, discounting, or rejecting the findings and opinions of Dr. Grey and Dr. Scott and in formulating plaintiff's RFC.  Remand is warranted on this issue.

**B.    PLAINTIFF'S OTHER ISSUES**

The Court notes that the ALJ's error in considering the findings and opinions of Dr. Grey

---

[7]    Plaintiff was 58 years old on the alleged onset date and thus met the Agency's definition of a person of advanced age (55 or older) at that time.  See 20 C.F.R. § 404.1563(e).  Advanced age significantly affects a person's ability to adjust to other work.  Id. (citing 20 C.F.R. § 404.1568(d)(4)).  By her date last insured, plaintiff had subsequently changed age categories to an individual closely approaching retirement age (age 60 or older), and the Commissioner has special rules for persons closely approaching retirement age.  Id.  Specifically, "[i]f you are closely approaching retirement age (age 60 or older) and you have a severe impairment(s) that limits you to no more than light work, we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry."  Id.

In this case, the VE testified that a hypothetical individual capable of light work with the same education and work background as plaintiff, could not perform the occupation of home attendant; he also testified that there were no "transferable skills that could be used in other occupations with little or no vocational adjustment."  [AR at 23-24.]  The VE further testified that a hypothetical individual who can perform light exertional work with frequent postural activities and occasional stooping, crouching, and crawling as in plaintiff's RFC would not be able to perform plaintiff's past relevant work.  Finally, the VE also testified that an individual who can perform medium exertional work but with only occasional reaching, handling, and fingering bilaterally, could not perform the home attendant position and that there would be no other jobs at the medium level that could be performed with the occasional manipulative limitations.  Because the ALJ found at step four that plaintiff is capable of performing her past relevant work, transferability of skills is not at issue.

However, if the ALJ had determined plaintiff was capable of no more than light work (instead of finding her capable of performing her past relevant work at the medium level), because (1) her past relevant work had no transferable skills, and (2) no other skilled or semiskilled work was available at the light level for an individual with plaintiff's RFC limitations as testified to by the VE, she would have been found to be disabled.  Similarly, if the ALJ determined plaintiff was capable of medium work, but that she could not perform her past relevant work as a home attendant due to being limited to only occasional manipulative limitations, because there are no transferable skills to skilled or semiskilled light work so similar to her previous work that she would need to make very little, if any, vocational adjustment, she would also have been found to be disabled under the Medical-Vocational Guidelines.

1    and Dr. Scott and his RFC determination impacts the rest of the issues raised herein by plaintiff.

2    For instance, in her second issue, plaintiff contends that the ALJ erred in finding that

3    plaintiff's bilateral upper extremity pain was not a severe impairment. [JS at 18.] She argues that

4    the ALJ improperly based this finding on the fact that there were no imaging findings in the record

5    regarding the upper extremities, because "this is not the standard for determining severity." [Id.

6    at 19.] She points out that the ALJ also failed to consider the fact that Dr. Scott's clinical findings

7    supported his upper bilateral extremity diagnoses and resulting manipulative limitations with

8    respect to lifting and carrying, reaching, grasping, manipulation, and overhead activity. [Id.] She

9    further notes that Dr. Grey's records also reflect the fact that plaintiff's upper extremity pain was

10   a medically determinable impairment that caused more than minimal limitations in her ability to

11   perform basic work activities. [Id. at 20.] She concludes that the ALJ's failure to include bilateral

12   upper extremity pain as a severe impairment was not harmless error because it "impacted the

13   RFC, evaluation of [plaintiff's] testimony and the determinations at Steps 4 and 5, which in turn

14   affected the ultimate question of disability." [Id.]

15   As previously noted, an ALJ errs when, as here, the RFC is incomplete and ignores

16   significant and probative evidence.  That error is not harmless because when the RFC is

17   incomplete, the hypothetical question to the VE is incomplete, and the ALJ's reliance on the VE's

18   answers is improper.  Here, there is no evidence to demonstrate that although the ALJ found

19   plaintiff's bilateral upper extremity issues to be medically determinable (albeit nonsevere), he gave

20   any consideration to or made any allowance for any functional limitations or restrictions as a result

21   of those nonsevere bilateral upper extremity issues.  Instead, he completely rejected Dr. Scott's

22   functional assessment limiting plaintiff to light work and only occasional reaching, grasping,

23   overhead activity, and manipulation with the bilateral upper extremities when he determined that

24   plaintiff could perform her past medium-level work as a home attendant.  In doing so, he implicitly

25   found that plaintiff could perform frequent reaching (presumably including overhead reaching) and

26   handling with her bilateral upper extremities.  See DOT No. 354.377-014 (indicating that frequent

27   reaching and handling is a requirement of the home attendant position).  In short, the ALJ failed

28

1   to engage in any specific analysis to explain how both plaintiff's severe and allegedly nonsevere
2   impairments were considered in formulating the RFC.

3        The ALJ's determination to reject and/or discount the findings and opinions of Dr. Grey and
4   Dr. Scott also impacts on his conclusion that plaintiff's subjective symptom testimony was not
5   entirely consistent with the medical and other evidence of record, which, according to the ALJ,
6   showed only mild to moderate findings.  Plaintiff contends that the ALJ failed to identify specific
7   inconsistencies between plaintiff's testimony and the medical evidence of record, including her
8   limited daily activities.  [JS at 33.]  She also argues that (1) there is no evidence of malingering on
9   plaintiff's part, (2) there is no evidence that the treating or examining physicians doubted the
10  severity of her symptoms, and (3) Dr. Grey's and Dr. Scott's findings and diagnoses are consistent
11  with the symptoms plaintiff alleges.  [Id.]  She submits that the ALJ failed to provide specific, clear,
12  and convincing reasons for rejecting her testimony, and failed to identify any specific conflicts
13  between the statements she made and the medical evidence in the record.  [Id.]  She also argues
14  that the ALJ took her "reported daily activities out of context."  [Id. at 38-39.]

15       Defendant responds to these arguments, stating that the ALJ properly considered plaintiff's
16  subjective system testimony, "including [among other things] the lack of objective evidence for the
17  extreme limitations Plaintiff alleged."  [Id. at 33.]

18       Because the Court has determined that the ALJ failed to provide specific and legitimate
19  reasons for discounting the opinions of Dr. Grey and Dr. Scott, and plaintiff's severe and
20  nonsevere impairments and subjective symptom testimony will again be at issue on remand, it will
21  not consider these issues herein.

22

23  **VI.**

24  **REMAND FOR FURTHER PROCEEDINGS**

25       The Court has discretion to remand or reverse and award benefits.  Trevizo, 871 F.3d at
26  682 (citation omitted).  Where no useful purpose would be served by further proceedings, or where
27  the record has been fully developed, it is appropriate to exercise this discretion to direct an

28

19

immediate award of benefits.  Id. (citing Garrison, 759 F.3d at 1019).  Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate.  See Garrison, 759 F.3d at 1021.

In this case, there are outstanding issues that must be resolved before a final determination can be made.  In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings.  First, because the ALJ failed to provide specific and legitimate reasons for discounting the treatment records Dr. Grey and for rejecting Dr. Scott's findings regarding plaintiff's limitation to light work, as well as his functional assessment limiting certain postural and manipulative limitations, the ALJ on remand shall reassess all of the medical opinions of record, both before and after plaintiff's date last insured.  The ALJ must explain the weight afforded to each opinion and provide legally adequate reasons for any portion of an opinion that the ALJ discounts or rejects.  Second, considering the record as a whole, the ALJ shall reassess the severity of plaintiff's medically determinable impairments, including those affecting her bilateral upper extremities and the pain resulting therefrom, and provide an explanation as to the effect, if any, that those impairments have on the ALJ's determination of plaintiff's residual functional capacity.[8]  Third, the ALJ on remand, in accordance with SSR 16-3p,  shall reassess plaintiff's subjective allegations and either credit her testimony as true, or provide specific, clear, and convincing reasons, supported by substantial evidence in the case record, for discounting or rejecting any testimony.  Finally, the ALJ shall proceed through step four and, if warranted, step five to determine, with the assistance of a VE if necessary, whether plaintiff can perform her past relevant work as a home attendant or any other work existing in significant numbers in the regional

---

[8]    Nothing herein is intended to disrupt the ALJ's finding that plaintiff has the severe impairments of degenerative disc disease of the lumbar spine, and osteoarthritis of the bilateral knees and the medically determinable conditions of thyroid dysfunction, hyperlipidemia, obesity, bilateral upper extremity pain, and affective disorder.  It is the severity of, and any manipulative limitations arising from, plaintiff's medically determinable condition of bilateral upper extremity pain that must be considered on remand.

and national economies.  See also Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 527-29 (9th Cir. 2014); Shaibi v. Berryhill, 883 F.3d 1102, 1110 (9th Cir. 2017).

**VII.**

**CONCLUSION**

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  June 16, 2021

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE